CASE 67—ACTION BY H. P. THOMPSON AGAINST ARCHER HARMON AND
OTHERS FOR BREACH OF CONTRACT IN THE SALE OF TOWN LOTS.—
JAN. 24.

# Harmon v. Thompson.

APPEAL FROM CLARK CIRCUIT COURT—J. SMITH HAYS, SPECIAL JUDGE.

JUDGMENT FOR PLAINTIFF. DEFENDANT HARMON APPEALS. AFFIRMED.

VENDOR AND PURCHASER—CONTRACT—CONSTRUCTION—PAROL EVIDENCE
—ADMISSIBILITY—TENDER OF DEED—MORTGAGE OF PREMISES—DAM-
AGES—TRANSFER OF CAUSE—DISCRETION OF TRIAL COURT—STAT-
UTE—JUDGMENT—AMENDMENT—APPEAL—COMPLAINT — SUFFICIEN-
CY.

1. Where, under the general rules for the construction of writ-
ten instruments, a contract can be given a consistent meaning
as a whole, parol evidence is inadmissible to explain it.
2. Where a contract for the sale of land set forth the price at which
the owner was willing to sell two-thirds of it, and that the other
parties to the contract desired to have the right of controlling
and selling said lands in lots of such size as would be most ad-
vantageous to them, and to account to the owner of said lands
for a certain price per acre, and that, if the property to be sold
was not paid for or secured by notes of the vendees of the per-
sons desiring to control the sale, the owner was to have an in-
terest with the other parties to the contract after that date, and
to have purchase-money notes for such balance before he made
them a deed, and that the one-third of the land retained by the
owner and not sold to the other parties was to be sold by them
in their general plan for subdividing the whole tract into town
lots, and that all parties should bear the expense of such division,
and that the owner was to receive pay for his one-third interest,
if sold in lots, at whatever price it might be sold, while for the
other two-thirds the owner was to get only his original purchase
price, the excess going to the other parties to the contract, it is
a clear and consistent contract, not admitting parol evidence to
explain the same.
3. The mistake of one of the parties to a written instrument in fail-
ing to have it express his intention is not available to him in
an action thereon.

4. In an action for damages for breach of a contract to purchase real estate, tender of a deed by the vendor is unnecessary where the vendee has. already declared that he will neither pay for the property nor accept a deed.   ·

5. Where, after verdict and judgment in an action for damages for breach of a contract to purchase real estate, it affirmatively appears that the plaintiff was able, ready and willing to comply with his part of the agreement within the time fixed by the contract, error in failing to so·allege in the complaint was cured..

6. Where the vendee of an executory contract to buy land abandons the agreement and refuses to comply with its terms, the vendor is entitled, after having made the election to proceed for damages for the breach, and after the time when by the terms of the contract the conveyance was to have been made, to mortgage the property, without regard to the contract.

7. The measure of damages for breach of a contract to buy land, as between the vendor and the vendee, is the difference between contract price and the actual value of the land on the date of the breach, when the actual value is less than the contract price, in addition to which interest may be awarded.

8. A delay of several years in bringing a case to trial can not affect the right of the plaintiff to recover what is due him, especially where the delay is reasonably accounted for by the plaintiff, and no substantial right of the defendant was invaded thereby.

9. Where a party entitled to have a cause on the equity docket transferred to the common-law docket for the trial of an issue fails to move therefor, it is within the discretion of the trial court to try the issue or order it transferred under the direct provisions of Civil Code of Practice, section 10.   ·

10. In an action for breach of a contract to purchase real estate, where the evidence showed conclusively that the defendants had abandoned the contract, it was not an abuse of discretion for the trial court to decide the question after the defendant had failed to move to have the issue transferred to the common-law docket for trial by jury.

11. The court has power, after announcing a judgment, to amend the order, before it is signed, to conform to the facts.   ·

BEVERLY R. JOUETT, WM. LINDSAY AND MORTON, WEBB & WILSON, ATTORNEYS FOR APPELLANT.

POINTS AND AUTHORITIES.

1. If this is an action suing for the purchase price or for specific performance to enforce a vendor's lien, the demurrer to

Harmon v. Thompson.

the petition should have been sustained, as appellee failed to allege that he was ready, willing and able to convey or tender a deed for same. Calvin v. Duncan, 12 Bush, 101; Williams v. Abrahams, 3 Bush, 186; Phillips v. Buck's Exr., 79 Ky., 465; Faulkner's Admr. v. Williman, 13 Ky. Law Rep., 107; Newman's Pleading and Practice, 371.

2. If it is a suit for damages sustained by appellee for failure of appellant to take and pay for the property, the petition should have alleged that appellee was ready, willing and able to convey a good title according to the terms of the contract. McBrayer v. Cohen, 92 Ky., 479.

3. The contract sued on being ambiguous, the court should have permitted parol evidence to show the intentions of the parties or the construction which they had put upon it. Breckinridge v. Duncan, 2 A. K. Mar., 50; Am. and Eng. Ency. of Law (2d ed.), vol. 2, p. 291; Henry's Exrs. v. Henry's Heirs, 81 Ky., 343; Vnncen. v. Citizens' G. L. and Coke Co., 16 L. R. A., 488; Topliff v. Topliff, 122 U. S., 1110; Chicago v. Sheldon, 76 U. S., 595; Thomson v. Thomson, 2 B. Mon., 166.

4. The acts of appellee in mortgaging to the Farmers' Tobacco Warehouse Company the property which he claims to have sold appellant was a repudiation of the contract by appellee. Wilhelm v. Fimple, 31 Iowa, 131.

5. It was error for the lower court to enter an order on October 24th, one day after the trial, and have that order written on the order book as of October 17th, in which he adjudged that appellant had repudiated the contract. 15 Ency. Plead. & Prac., pp. 316 and 331; Smith v. Spalding, 3 Robert (N. Y.), 615; 30 Howards (N. Y.), 339; Schultz v. Winter, 7 Nevada, 130; Russell's Heirs v. Claxton's Heirs, 12 Bush, 558.

6. Peremptory instructions should have been given to find for appellant.

PENDLETON & BUSH, J. H. HAZELRIGG AND J. M. BENTON, FOR APPELLEE.

### QUESTIONS AND AUTHORITIES.

1. If the petition sounds in damages, the fact that it is filed in a court of equity does not change its aspect, or make it any the less a suit for damages; and the question of the proper forum for trial can not be raised by demurrer to the petition, it should be presented by motion to transfer to the proper docket. Ky. Mutual Co. v. Turner, 89 Ky.. 665; Turner v. Newman, 19 Ky. Law Rep., 231.

2. The payment of the purchase price and the performance of

other conditions by appellant, and the delivery of the deed by appellee were not mutual and concurrent conditions. The appellant was required to perform certain precedent conditions, including the payment of the purchase price, prior to the delivery of the deed by the appellee, and upon the failure of appellant to perform the conditions precedent and pay the purchase price, at the appointed time, appellee had a right to institute his suit without having tendered a deed or alleging in his petition that he was ready, able and willing to convey a good title. 7 Amer. & Eng. Ency. of Law, pp. 118 and 121; Passmore v. Moore, 1 J. J. M., 591; Spriggs v. Alvin, 6 J. J. M., 161; Williams v. Henry, 3 Den. (N. Y.), 366; 4 Ency. of Pl. & Pr., 627, 636, 639; Sousley v. Burns' Admr., 10 Bush, 90.

3. Even if appellee had carried the burden of the condition precedent, and had failed to allege performance, or offer or ability to perform, the appellant did not stand on his demurrer, but answered to the merits and tried out the case on the issues, and the objections raised by the demurrer were waived and the defects cured by the verdict. 4 Ency. of Pl. & Pr., 662, and cases there cited; Duncan v. Brown, 15 B. M., 196; Roundtree v. Hendrick's Admr., 1 B. M., 189.

4. Appellee was not only willing and able to convey a good title to appellant, but did convey acceptable titles to all those to whom appellant sold lots, and appellant took possession of the property, and thus accepted appellee's title, and vouched for same in the sales to others.

5. The contract not being ambiguous, it is not open to interpretation or construction, either by showing the acts of the parties or other facts.

6. Upon the breach of a contract for the sale of property, occasioned by the buyer, the seller can keep or dispose of his property at his pleasure. If appellant had not repudiated the contract at the time appellee's action was instituted, appellee had no cause of action. On the other hand, if appellant had repudiated the contract, he was not interested in any disposition of the property thereafter made by appellee.

7. The defendants being obligated to sell plaintiff's land, and to open such streets and alleys as they thought proper, they have been properly charged with their share of the expenses incurred in advertising the sale of lots, because the advertising expense is a necessary incident to the undertaking to sell; and they can not complain that there was no mutual agreement as to the location and cost of the streets, because it was their duty to open the streets, and primarily pay for same, and they did open and locate these streets through their engineer, for which work the plaintiff paid.

8. The defendants admittedly failed and refused to carry out the contract as construed by the court, and the question of abandonment was a question of law for the court and not an issue for the jury.

9. The judgment of a court is a judicial act, and the act of the clerk in entering it is merely ministerial, and the validity of the judgment is not affected by the failure of the clerk to enter it. When a judgment has been rendered and same has not been entered through neglect of the clerk, the court has power to have same entered as of the date when rendered. 18 Ency. Pl. & Pr., 452, 453; Newman v. Cincinnati, 18 Ohio, 323; Black on Judgments, vol. 1, secs. 130, 131, 153.

OPINION OF THE COURT BY JUDGE O'REAR—AFFIRMING.

This suit involved the construction of the contract copied below, the measure of damage for its breach, and the nature and requisites of the action upon it.

The contract is worded as follows:

"This agreement witnesseth that whereas H. P. Thompson owns certain lands in and near Winchester, Kentucky, and whereas the undersigned B. E. Talbutt and Archer Harmon desire to have the control and right of selling said lands consisting of the unsold lands lying south of Belmont street, which runs south of the house of said H. P. Thompson and on the boundary bought by him of James Ballard's heirs, amounting to between one hundred and one hundred and twenty-five acres, lying south of said Belmont street in the town of Winchester; now it is agreed between the parties hereto as follows: Said Talbutt and Harmon undertake to sell said lands in lots of such size as may suit purchasers and be most advantageous to the interest of the sellers, and to account to said Thompson for said land at the price of six hundred dollars per acre for two-thirds of the said land, and to leave the said Thompson the owner of the other third—that is to say, that the said Thompson shall receive pay for two-thirds of said land at the rate of

six hundred dollars per acre, and be entitled to the other third of said purchase money of said lands. The said Talbutt and Harmon shall open such streets and alleys through such lands as they may think proper; one-third thereof shall be chargeable to said Thompson, and two-thirds thereof to said Talbutt and Harmon, but the whole expense thereof is primarily to be borne by said Talbutt and Harmon, and said Thompson is to pay his one-third of said expenses. All the streets to be opened shall be by mutual agreement of the parties as to location and cost thereof, and not without such consent. Before deeds are made to said Harmon and Talbutt for the said lands, the said Thompson is to receive two-thirds of the purchase price at the rate stipulated above in money or satisfactory notes. No interest is to be charged by Thompson until after January 1st, 1891, and he shall not account for interest for such sums as may be received by him in excess of his two-thirds. For the balance due on the 1st day of January, 1891, notes are to be given with lien on the remaining land, or such security as said Thompson may accept in lieu thereof. [Signed] H. P. Thompson, Archer Harmon, B. E. Talbutt. Witness: B. F. Buckner."

The contract was made February 17, 1890. At that time, and for some time prior, there had been considerable animation at Winchester in the real estate market. A "boom," so common during that period, was being experienced. Appellee had cut a farm, or a good part of it, into town lots, and was selling them at fairly remunerative prices. Appellant and Talbutt were promoters or speculators dealing in town lots in various localities where active speculation was possible, owing to inflated prices and excited expectations. Appellee's contention in this case is that they were attracted by what appeared to be favorable opportunities

afforded by his property at Winchester, and bought it for that purpose. Appellant contends, on the contrary, that he and Talbutt engaged merely to promote appellee's venture in exposing his lots to public sale. The paper is said to be ambiguous, and, because of that claim, it was sought by appellant to have his construction of its meaning aided by extraneous evidence.

It is not every contract of vague or slightly obscure meaning that calls for, or that will admit of, other evidence to aid in its interpretation. If the paper itself affords a reasonably clear understanding of what the parties have engaged themselves to, it is safer, and it is the law, that its language alone should be consulted in arriving at that meaning. It is upon that reason that such rules as that all the terms of the writing must be consulted and reconciled, if possible, are founded. For, when the parties to a contract have deliberately written down and signed a memorial of their undertaking, it is presumed, and, in the absence of fraud or mutual mistake, it is conclusively presumed, that the whole of the undertaking, and all negotiations leading up to it, are merged in the writing. The writing is the best evidence, and, so long as it can be produced, is the only evidence receivable, of what the parties have agreed to do, and of their whole meaning with reference thereto. It were better if all agreements were perfectly clear and free from controversy. But they are not. It does not at all follow from that fact, though, that all agreements not perfectly plain and having but one possible interpretation are subject to be explained in every case by extraneous and parol evidence. If such were so, the value of written contracts would be reduced to a minimum, if not nil. It is because such is not the law that the numerous rules for construing written contracts are in existence. For, most·

Harmon v. Thompson.

obviously, a perfectly plain, undoubted meaning needs no
rule to aid in its construction. So, when the written terms
seem to be in conflict with each other—where some part
of the writing is apparently inconsistent with another part—
it does not follow that the bars are to be let down, and
parol evidence, with its train of uncertainties, admitted.
Before that is allowed, the resources of the paper itself must
be exhausted. That is what the law assumes the parties
intended by reducing the agreement to writing, for, if it
were to be left to parol testimony as to any part of its
meaning, it was idle to have been to the trouble of having
it written down. When, after applying to the writing those
rules of interpretation found safe and just in the experi-
ence of the law, the meaning, or the probable meaning,
in law, of the parties, can be fairly gathered with a cer-
tainty satisfying the judicial mind, the courts will consult
the writing alone, rejecting extraneous evidence as aid in
construing it. But where, after applying the rules of in-
terpretation applicable to the writing alone, the judicial
mind is still in doubt as to the meaning of the parties, and
there exists a latent ambiguity, the law admits parol or
other outside evidence to explain what was meant by the
writing. Technical terms and trade expressions afford prob-
ably the most numerous instances of the application of the
rule just stated, though there are, of course, many others.

Can the intention of the parties to the agreement sued
on be gathered from that writing? Subjecting the paper
to analysis, it appears clearly enough that Thompson, the
owner of the land described, wanted to sell it, and was by
that paper undertaking to sell it. The price at which he
was willing to sell two-thirds of it is fixed at $600 per acre.
Appellant and Talbutt appear in the paper as both buyers
and sellers. They were not selling to Thompson. They had

to buy from him before they could sell to anybody, unless
they were authorized by Thompson to sell for him. To buy
from him, the terms upon which they were to get the land
must be agreed on. So it was stated that Thompson was
to receive $600 per acre for what he was selling, viz., two-
thirds of the tract. But that was not the whole agreement.
It was contemplated, as shown by the paper, that appellant
and Talbutt were to resell, and possibly immediately before
the date when by their agreement they would be compelled
to pay for what they wede buying. To protect Thompson
in so parting with his title, it was therefore proposed in
the paper that, in the event such sales were made, the pur-
chase money, or acceptable purchase-money notes, if notes
were taken in lieu of cash, were to be turned over to Thomp-
son to the extent of $600 per acre for such parts as were
so sold, he not accounting for interest on it. It seems, from
the paper, to have been also contemplated that some part,
or maybe the whole, of the purchase money for the land
sold Harmon and Talbutt by Thompson, would not be paid
or secured by notes of Harmon and Talbutt's vendees be-
bore January 1, 1891. It was therefore provided that in
that event Thompson was to have interest from Harmon
and Talbutt after that date, and to have purchase-money
notes for such balance before he made them a deed. Other
features of the contract show that Thompson expected and
that the parties agreed that Thompson's one-third of the
land not sold to Harmon and Talbutt was to be sold by
them in their general plan of subdividing the whole tract
into town lots, and selling them off. The paper provided
for the expense of such division, all the parties bearing it
in proportion to their ownership of the whole tract. It
was likewise provided that Thompson was to receive the
pay for his one-third interest in the tract, if sold in lots

Harmon v. Thompson.

under this scheme by Harmon and Talbutt, at whatever price it might be sold, while for the other two-thirds—the part sold to Harmon and Talbutt—Thompson was to get only his original purchase price; the excess going to the owners, Harmon and Talbutt. Thus construed, every term, every provision, and every word of the contract as written is accounted for and given a consistent meaning, while the whole document is given a rational construction.

To adopt appellant's theory, which is that he and Talbutt were merely promoters, and were to sell Thompson's land for Thompson and on commission—the commission being the excess price realized on the part sold over $600 per acre—would necessitate the ignoring or expurgation of several very explicit and important provisions of the agreement. That is never done when it is possible to avoid it, nor unless it clearly appears that such provisions are annulled intentionally by other provisions of the paper. For it must always be borne in mind that the office of the court is to arrive at the meaning of the parties—not necessarily what may have been in the minds of either one or both of them, but their meaning as it may be gathered from their written agreement. It would not do to allow, years after or at any time after a written agreement has been executed, upon a disagreement arising as to its meaning, to hear evidence outside the contract as to what the parties meant, simply because the paper admits of a doubt as to its meaning. Parol evidence would not be safer as a guide to the original intention of the parties, in the absence of an allegation of fraud or mutual mistake, than the law's process of confining the inquiry to the agreed document so long as it is susceptible of reasonable certainty in being understood. Otherwise every disputable clause in a written document would open it up to every evil of chance, of misrecollection, and

of perjury that the parties have attempted to avoid by reducing the matter to writing.

Under these rules, the court did not err in rejecting appellant's amended answer pleading his interpretation of the contract, although it was said that it was a mistake if the contract did not so express the meaning of the parties. For the mistake, to be available, must have been a mutual mistake, and not that alone of one of the parties to the agreement. It was not pleaded that it was a mutual mistake. In that state of the record, it devolved upon the court to construe the writing. That construction was in accord with the one we have given it.

Harmon and Talbutt caused a sale to be made of some of the lots before January 1, 1891. The prices realized were less than $600 per acre. The sale was discouraging, and marked the enterprise a failure. Whereupon Talbutt and Harmon abandoned the contract, and refused to have anything further to do with it. Early in 1891, appellee brought this suit, alleging the abandonment and consequent breach of the contract, and praying judgment for some $51,000 in damages because thereof. Other features of the petition are seized on as showing that appellee was endeavoring to hold appellant and Talbutt bound for a specific execution of their undertaking. But upon the whole, it satisfactorily appears that the real action was to recover damages for the breach of the undertaking by appellant and Talbutt to receive and pay for the land within the time stated. The case from the beginning seems to have been constructed upon that theory. A demurrer to the petition was overruled. The ground of the demurrer is, conceding the suit to be one to recover damages from the vendees for their refusal to take and pay for the property as agreed, that the petition fails to aver that the plaintiff was able and willing to convey to

the vendees on January 1, 1891, a good title to the property, and did not aver a tender of a deed; also that the petition did not aver that plaintiff was then willing, ready, and able to convey a good title. A contract to sell land, unlike one to sell personal chattels, gives to the vendor choice of two remedies for its breach by the vendee: One, an action against the vendee for specific execution of the contract, in which case the vendor must aver and show that he has the title contracted to be sold, and must tender it. The other is a suit to recover the damages sustained by the vendor by his vendee's breach of the contract where the breach is occasioned by the vendee's abandonment. In the latter case, the vendor elects, as he may do, to retain the property, where the agreement is executory, and proceeds to recoup himself in damages from the vendee. The vendee, having broken the contract, is not entitled to have it enforced if the breach is an abandonment of it and a refusal to execute his part of it. Nor is it necessary for the vendor to tender to his vendee a deed when the latter has already declared that he will neither pay for the property nor accept the deed. The reason for requiring a tender in an action to enforce the specific execution of a contract is wholly lacking in a suit where it is sought to recover damages because the vendee has abandoned and refused to perform the contract. As the law does not require the doing of a vain thing, it will not require a pleading to aver that the pleader has offered to do what the defendant admits he would not accept if done.

That appellee was able and willing and ready to convey the title as agreed on January 1, 1891, was a necessary allegation, because it was an essential fact. For, although his vendees were in default in failing to take the property, yet, to entitle him to recover damages, he must have owned

the property, and have been in position to have complied
with his contract according to its terms. This defect in
the petition is one of form. After verdict and judgment,
it affirmatively appearing by the record that appellee was
able, ready, and willing to comply with his part of the
agreement within the time fixed by the contract, the de-
fect in the pleading was cured. Duncan v. Brown, 15 B.
Mon., 196; Rountree v. Hendrick's Admr., 1 B. Mon., 189;
Hill v. Ragland, 114 Ky., 209, 24 R., 1053, 70 S. W., 634.

After January 1, 1891, appellee incumbered this property
by mortgage, under which it was sold before this case came
on for trial. It is contended by appellant that this act of
appellee's was an abandonment by him of the contract; that
by that act and its consequences he put it out of his power
to comply with his agreement, and for that reason can not
recover against his vendees. Where the vendee of an exe-
cutory contract to buy land abandons the agreement and re-
fuses to comply with its terms, the vendor, upon electing to
proceed for damages for the breach, may, after having made
his election, and after the time when by the terms of the
agreement the conveyance was to have been made, dispose of
the property by sale or otherwise, and without regard to
the contract. It is the vendor's property. The contract
repudiated by the vendee can not give the latter any right
to the land, nor to control it. The only question then open
between the parties is the extent of the damages sustained
by the vendor for the breach. These he is entitled to recover
in addition to the land. McBrayer v. Cohen, 92 Ky., 479,
13 R., 667, 18 S. W., 123. The vendee has no more right
to control the vendor's use or disposal of his own land
before the verdict and judgment fixing the damages than he
would have after they were so fixed and paid. Upon such
breach the quantum of damages is the difference between

the contract price and the actual value of the land on the date of the breach, provided the actual value is less than the contract price. In addition, interest may be awarded. Such was the course pursued by the trial court in this case.

That the case dragged along for several years before trial can not affect the right of appellee to recover what is legally due him. Appellant might have insisted on an earlier trial if he had desired it. The delay is reasonably accounted for by appellee. No substantial right of appellant seems to have been affected by it.

The action for a while was on the equity docket. On appellant's motion, it was transferred to the common-law docket for a trial by jury. Before the order of transfer was made, the court decided upon the face of the record that appellant and Talbutt had abandoned the contract as of January 1, 1891. The evidence then in the record, in the form of depositions and exhibits, fully sustains the judgment. Whether there had been such abandonment was an issue in the case. Had appellant moved for the transfer of that issue to the common-law docket when he answered, it would have been so ordered. Section 10, Civil Code Prac. But he did not then move for it. It was thereafter within the discretion of the trial judge whether he would order it transferred. On the subject of an abandonment by appellant and Talbutt, the evidence is all one way. In truth, it is not contended seriously in the argument for appellant that he had not abandoned the contract. It was not an abuse of discretion by the trial judge to decide that question himself, and to send the question of damages to the jury to try. The judgment of the court, decreeing that appellant had abandoned the contract January 1, 1891, was not entered till October 24, 1903, although the judgment was in fact announced by the court on October 17, 1903. Before

the orders of the latter date were signed, the court amended them so as to conform to the facts stated. We see nothing in this prejudicial to appellant, or that was beyond the power of the court to do.

Perceiving no error in the record, the judgment is affirmed.