NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0380n.06

Case No. 13-6379

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
May 21, 2014
DEBORAH S. HUNT, Clerk

WILLIAM JEFFREY HOWARD, et al.,     )
                                         )
     Plaintiffs-Appellants,         )
                                         )     ON APPEAL FROM THE UNITED
v.                                   )     STATES DISTRICT COURT FOR
                                       )     THE WESTERN DISTRICT OF
MERCER TRANSPORTATION          )     KENTUCKY
COMPANY, INC., et al.,           )
                                       )
     Defendants-Appellees.         )
                                       )

BEFORE: COLE and SUTTON, Circuit Judges; CLELAND, District Judge.[*]

SUTTON, Circuit Judge. For want of a pair of parentheses, this case ended up in federal court. After one of Mercer Transportation's three partners died, the company and his estate could not agree what the company owed the estate under an agreement signed by the partners. We agree with his estate's interpretation of the agreement, and so reverse the district court's contrary conclusion.

I.

Herbert Ligon, Jr., William Howard and James Stone each owned a third of the shares of the Mercer Transportation Company. In a nod to mortality, the trio signed an agreement in 1996

---

[*] The Honorable Robert H. Cleland, United States District Judge for the Eastern District of Michigan, sitting by designation.

(later amended in 2004) laying out a process for compensating the estate of a deceased partner. When one of the partners died, the agreement provided that the company and the remaining shareholders could buy back the deceased's shares.

In addition to permitting ownership of the company to remain with the living partners, the agreement sought to provide fair compensation to the estate of the deceased partner. Two provisions took aim at this objective. The first—section 4.1—sets a price for the deceased's shares: Double the "book value" of the company divided by the total number of shares. R.5-1 at 9–10. "Book value" is defined as the company's value "as of the fiscal or taxable year end nearest the date of death," excluding any earnings from the year used to determine the book value. *Id.* at 9; R.5-2 at 6. Section 4.1 adds that

> in addition to the payment of the purchase price [for the shares], the selling Shareholder's estate shall be entitled to his portion of the undistributed earnings for the period or year preceding the date of death and excluded from Book Value plus the earnings for the period as set forth in Section 5.4.

R.5-2 at 6. The second provision—section 5.4—required the company to pay the estate "all earnings of the Corporation as reflected by the K-1 issued by the Corporation during the year of the death and the five years thereafter." R.5-1 at 11.

After Howard died on March 22, 2008, a conflict arose over the meaning of these provisions. Believing the company had misinterpreted section 5.4 of the agreement, the estate sued for breach of contract. Both parties asked the district court to resolve their disagreement on the pleadings. The district court sided with the company, and the estate appealed.

II.

After Howard's death, section 5.4 requires the company to pay the estate a portion of its earnings for a number of years. The company must pay the estate "all earnings of the Corporation as reflected by the K-1 issued by the Corporation during the year of the death and

2

the five years thereafter." R.5-1 at 11. A K-1 Form (much like a 1099 Form) lists a partner's "share of the partnership's income, credits, deductions, etc." from the previous year for tax preparation purposes. West's Tax Law Dictionary § S410.

The question is whether the phrase "during the year of the death and the five years thereafter" modifies "earnings" (the estate's view) or "issued" (the company's view). In other words: Does section 5.4 require the company to pay the estate its earnings (as reflected by the K-1 issued by the company) during the year of death and the five years thereafter—earnings from 2008 through 2013? Or does section 5.4 require the company to pay the estate its earnings that are listed in the K-1 forms issued by the company during the year of death and the five years thereafter—earnings from 2007 through 2012?

Words are best known by the company they keep—by the context in which they appear— and the setting of these words supports the first interpretation. *See Jones v. Riddell*, 5 S.W.2d 1077, 1078 (Ky. 1928) (stating the "cardinal rule" that an agreement's meaning "is to be ascertained from the words employed taking into consideration the whole context of the agreement"). Only the first interpretation, to start, works comfortably with the rest of section 5.4. An amendment to the section clarified that the death of one of the three original founders triggers the requirement of "payment of dividends for the five (5) years following the year of death." R.5-2 at 7. Dividends paid in any given year represent payment "for the" previous year's earnings. *See, e.g.*, R.5-1 at 11 (allowing the company "a period of twelve (12) months following the end of any year to pay the dividend for the preceding year"). So the reference in the amendment to the requirement of dividends "for the" five years following 2008 (the year of death) means dividends "for the" company's earnings in 2009 through 2013. The first interpretation, which requires payment on the company's earnings from 2008 through 2013,

leads to that result. The second interpretation, which requires payment on the company's earnings from 2007 through 2012, does not.

No less importantly, the first interpretation gives meaning to section 4.1. That section clarifies that the estate receives three things: (1) "the purchase price" for its stock, (2) the shareholder's "portion of the undistributed earnings for the period or year preceding the date of death and excluded from Book Value," "plus" (3) "the earnings for the period as set forth in Section 5.4." R.5-2 at 6. The "book value" of the company is its value as of the year end closest to the date of death, minus any earnings from that year. R.5-1 at 10; R.5-2 at 6.

Two examples show how section 4.1 and section 5.4 interact. Partner A (like Howard) dies in March 2008. The book value is the company's value at the end of fiscal year 2007, excluding any earnings from 2007. His estate gets the value of its stock, the undistributed earnings from 2007, plus the earnings described in section 5.4. Partner B dies in August 2008. The book value is the company's value at the end of fiscal year 2008, excluding earnings from 2008. His estate gets the value of its stock, the undistributed earnings from 2008, plus the earnings as described in section 5.4.

The clarifying language in section 4.1 has meaning only if section 5.4 gives the estate a right to the company's earnings from the year of death and the five years thereafter. Under that reading, Partner A's estate receives the value of his stock, the undistributed earnings from 2007, "plus" the earnings from 2008 through 2013. That is, the second benefit listed in section 4.1 gives the estate something it does not already get under section 5.4. If by contrast section 5.4 gives the estate a right to the earnings from the year *before* the year of death and the five years thereafter, Partner A's estate receives the value of his stock, the undistributed earnings from 2007, "plus" the earnings from 2007 through 2012. Section 5.4 would always include the second

benefit listed in section 4.1, so it would always render that language in section 4.1 redundant. Kentucky law discourages an interpretation of the agreement that would allow part of section 4.1 to "perish by construction, unless insurmountable obstacles stand in the way of any other course." *Siler v. White Star Coal Co.*, 226 S.W. 102, 104 (Ky. 1920) (internal quotation marks omitted).

To all of this, the company offers two responses. It first points out that *both* readings of section 5.4 render section 4.1 redundant in the case of Partner B. True enough, since both readings of section 5.4 give the estate a right to earnings from the year of death. But no principle of contract law suggests that an interpretation of an agreement that *always* makes one provision redundant wins out over an interpretation that *sometimes* makes that provision redundant. The company also argues that the estate's interpretation requires the insertion of parentheses around the phrase "as reflected by the K-1 issued by the Corporation" in section 5.4. A pair of parentheses indeed would have prevented this case. But the best reading of the agreement as is (even without parentheses) still favors the estate.

The company and the estate each point to extrinsic evidence in support of their interpretations. That evidence matters only when, after "the resources of the paper itself [are] exhausted," a best reading of the contract does not emerge. *Akins v. City of Covington*, 97 S.W.2d 588, 590 (Ky. 1936). That is not this case.

III.

For these reasons, we reverse the judgment of the district court.